UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN MARQUIS HOLMES,<br>Plaintiff,<br>v.<br>CHARLES COFFEY, MD, et al.,<br>Defendants. | Case No. 25-cv-02784-RFL (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. No. 32 |

**INTRODUCTION**

Plaintiff Brian Holmes alleges in this 42 U.S.C. § 1983 action that his July 2022 fall and the injuries he suffered were the result of prison employees failing to grant him a housing accommodation. According to Holmes, this failure constituted deliberate indifference under the Eighth Amendment, negligence under state law, and a violation of California's Elder Abuse and Dependent Adult Civil Protection Act. Defendants move for summary judgment. Holmes has not filed an opposition or any other response to the motion.

Defendants' summary judgment motion is GRANTED. The undisputed record shows that his doctor's treatment plan, and alleged refusal to grant him a housing accommodation, was reasonable and did not violate Holmes' constitutional rights; that the other Defendants had no authority to grant him a housing accommodation and therefore cannot be held liable for deliberate indifference; and that his state law claims are time-barred.

**BACKGROUND**

**I. Diagnosis and Treatment**

Holmes alleges that in "mid-July 2022," prior to his July 2022 fall, his primary care physician at Salinas Valley State Prison, Defendant Charles Coffey, ordered a walker for him "to

help plaintiff cope with various medical conditions, including lightheadedness, dizziness, and black-outs," which arose from orthostasis, a condition Coffey knew Holmes had been afflicted with for the prior two years. (Compl., Dkt. No. 5 at 5.) Holmes alleges that he asked Coffey to order lower-tier housing for him because he would have to use the stairs with his walker in his current second-tier housing arrangement. (*Id.*) Coffey allegedly refused his request. (*Id.*)

Defendant Coffey offers a different version of events. On June 22, 2022, he examined Holmes in response to his complaints of numbness to his arm, hands, and fingers, his neck locking up, dizziness upon standing, and nosebleeds. (MSJ, Coffey Decl., Dkt. No. 33 ¶ 8.) Holmes told Coffey that he had experienced dizziness since contracting COVID in 2021, that "most of the time" when he stands up his "field of vision goes black," that he has collapsed four times, that when he experiences dizziness, he takes precautions to steady himself. (*Id.* ¶ 9.)

Coffey diagnosed Holmes with orthostatic hypotension, "which is a drop in blood pressure upon standing that causes symptoms like dizziness, lightheadedness, weakness and fainting." (*Id.* ¶ 10.) "In many patients, these symptoms of orthostatic hypotension only occur upon standing and usually resolve very quickly — in a matter of seconds. Based on my examination of Mr. Holmes and his description of his symptoms, I concluded that his symptoms only occurred upon standing from a sitting position and were very short in duration." (*Id.*) Coffey sent Holmes to a local emergency room for further evaluation, after conferring with another SVSP physician. (*Id.*) The outside physician confirmed Coffey's orthostasis diagnosis, and discharged him in a stable condition. (*Id.* ¶ 11.)

Coffey saw Holmes the next day (June 23, 2022) in the A yard medical clinic to follow-up. (*Id.* ¶ 12.) He ordered a walker for Holmes "so that he would have something to steady himself upon standing if he became temporarily dizzy or lightheaded." (*Id.*) On that day, he "provided Holmes with medical advice to address the symptoms from his orthostasis — including drinking more water and standing up slowly." (*Id.* ¶ 23.)

Coffey avers that Holmes "did not inform me during this visit that he resided in an upper-tier cell or that he had experienced any issues navigating the stairs to the upper tier." (*Id.* ¶

12.) He "also did not inform me that he had any prior problems navigating any other stairs in the prison or walking since his episodes of dizziness first began in 2021." (*Id.*) Also, "Holmes did not request that I arrange for him to change his housing assignment or express to me that he had any concerns about his assignment to an upper-tier cell." (*Id.*) As of July 14, 2022, "Holmes had not been diagnosed with or assessed for any mobility or disability impairments, there is no record that he had submitted any requests for reasonable accommodations to address any mobility impairments, and he had not asked me to provide a reasonable accommodation or disability diagnosis." (*Id.* ¶ 17.) Coffey avers that none of Holmes's statements, presentation or demeanor prior to July 14, 2022, indicated to him that "he was unable to walk, use stairs, or that he had any mobility." (*Id.* ¶ 18.) "To the contrary, his description of his symptoms indicated that he only had very short dizzy spells upon standing from a sitting position, consistent with orthostatic hypotension." (*Id.*)

Coffey avers that "when I prescribed a walker to Mr. Holmes, I knew, based on Holmes'[s] statements to me on June 22 and to the emergency room physician who examined Holmes on June 22, that Holmes could tell when he was going to have a syncopal or presyncope episode (becoming lightheaded, dizzy or faint), that this symptom only happened upon standing from a sitting position, and that Holmes was able to take precautions to avoid falling, such as steadying himself, sitting back down, or sitting on the ground." (*Id.* ¶ 22.) "Based on my experience in treating hundreds of inmates at San Quentin and SVSP, I understood that a medical chrono that provides a reasonable accommodation for housing is based on medical necessity for patients with mobility impairments. Mr. Holmes did not have a mobility impairment as of June 23, 2022." (*Id.* ¶ 24.) In his professional judgment, Coffey "Holmes did not meet the criteria for or have a medical need to be moved to a lower tier cell when I prescribed his walker to him on June 23, 2022." (*Id.* ¶ 25.)

At his deposition, Holmes testified that when he arrived at SVSP in July 2021 he was medically examined and did not have any medical chronos or special housing accommodations. (MSJ, Holmes Depo., Dkt. No. 40-2 at 13.) He testified that before July 14, 2022, he had no

work restrictions, was cleared for full duty, and had not been diagnosed with any mobility restrictions. (*Id.* at 8, 14-15.)

## II. Defendants Mancillas, Alcantar, and Nakawuka

Holmes alleges that after he received his walker and after "experiencing difficulty walking up and down the housing unit stairs to and from his cell and having come close to falling while on the stairs," he told Defendants Correctional Officers Mancillas and Alcantar "at least once of his difficulty." (Compl., Dkt. No. 5 at 5.) He alleges that these Defendants refused his request to move him to a lower tier. (*Id.* at 5-6.)

Defendant Mancillas attests that "I understood from my personal observations of Mr. Holmes on the yard and in the housing unit, from a review of his SOMS file; and from the fact that he did not have a disability vest, that he had no mobility issues and that he was not at risk of a fall due to any medical issues." (MSJ, Mancillas Decl., Dkt. No. 34 ¶ 11.) Mancillas recalls that Holmes asked him "to move him to a lower tier cell." (*Id.* ¶ 12.) He responded by "telling him that I could not move him to a lower-cell because he did not have a lower-tier chrono or any mobility restrictions that necessitated a lower-tier placement." (*Id.*) He told Holmes that he would have to go to his doctor to get the appropriate chrono. (*Id.*)

Mancillas has presented undisputed evidence that "[i]ndividual housing floor officers are not in charge of assigning an inmates's DPP [Disability Placement Program] code, nor can they independently change it." (*Id.* ¶ 9.) "If an inmate wishes to be assigned a new or different DDP code, he must submit a Reasonable Accommodation Request form (CDCR form 1824). Orally communicating to floor officers their dissatisfaction to an officer is not sufficient." (*Id.* ¶ 10.)

Officer Alcantar avers that he does not know nor has he ever had a conversation with Holmes. (MSJ, Alcantar Decl., Dkt. No. 35 ¶ 2.) Also, he avers he was not working in Holmes's housing unit in June and July 2022 and therefore could not have been aware of or disregarded a risk to Holmes's safety. (*Id.* ¶ 4.) Even if Alcantar had been present, Defendants have presented undisputed evidence that Alcantar had no authority to change a prisoner's housing assignment. (MSJ, Mancillas Decl., Dkt. No. 34 ¶¶ 9-10.)

As to Defendant Nakawuka, who is a nurse, Holmes alleges that on July 14, 2022, Nakawuka saw him "traversing" the stairs with his walker. (*Id.* at 6.) Nakawuka asked him about "accessing the upper tier while using a walker." (*Id.*) He told her that he was housed in an upper tier cell, that he had "difficulty going up and down the stairs with the walker," that he had "experienced near falls," and that believed he was in danger. (*Id.*) Holmes alleges that Nakawuka "had the authority and opportunity to start the lower tier housing process, even if only by advising her superiors of the danger." (*Id.* at 6-7.)

Nurse Nakawuka avers she was not present in Holmes's housing unit on July 14, 2022, does not know Holmes, and had not observed him traversing his unit with his walker. (MSJ, Nakawuka Decl., Dkt. No. 38 ¶¶ 4,6.) Also, Defendants have presented undisputed evidence that Nakawuka has no authority to change a prisoner's housing assignment. (*Id.* ¶ 5.)

## III. The Fall and Treatment

Holmes alleges that on July 14, 2022, at Salinas Valley State Prison he fell while descending the stairs of his second-tier housing unit, which resulted in a head injury and a visit to an outside hospital. (Compl., Dkt. No. 5 at 7.) During a phone call with his mother the day after the fall, Holmes described the events of July 14, 2022:

> I was coming down the stairs, because my nose — my nose was already bleeding, and then I already knew what was fixing to happen next. So, I — so I waited until I came out the cell. My cellie, he put — he put the walker at the end of the steps for me. And when I was walking down the stairs, I was holding onto the stairs, and then as soon as my leg gave out, it was a wrap. I was like, oh, God. I was like, oh shit, I'm fixing to fuck myself up bad, and I just — I just flew from the third step straight into the walker and then straight to the floor, and I flipped over and the — over the walker.

(MSJ, Thorn Decl., Transcript of 7.15.22 Phone Recording, Dkt. No. 40-3 at 12.) At his deposition, he testified that on the day of the fall he was <u>in his cell</u> when he felt dizzy and his nose had started bleeding. (MSJ, Holmes Depo., Dkt. No. 40-2 at 22.) After the fall, Holmes was taken to the prison's urgent care facility, and then sent to an emergency room at an outside hospital for further treatment and evaluation. (MSJ, Coffey Decl., Dkt. No. 43 ¶¶ 14, 15.) The

emergency room provider's note states:

> Brian Holmes is a 40-year-old black male from Salinas Valley State prison who reports that he stepped off a step when he lost his balance and fell backwards and hit the back of his head patient is complaining of head pain some neck pain and low back pain. Patient reports that he tripped and fell backwards onto his buttocks and then hit the back of his head. No loss of consciousness. Patient has a history of hypertension on lisinopril diabetes on metformin.
>
> . . .
>
> 40-year-old black male from Salinas Valley State prison brought in by ambulance after ground-level fall after he stepped off a step with his walker to get in the medication line, patient reports he tripped and fell backwards onto his buttocks and hit the back of his head. Patient denied loss of consciousness but is complaining of left fourth and fifth finger numbness and some neck pain and some low back pain.

(MSJ, Coffey Decl., Emergency Room Report, Dkt. No. 33-7 at 2, 3.)

Coffey examined Holmes on July 18, 2022. (MSJ, Coffey Decl., Dkt. No. 33 ¶ 16.) Holmes told Coffey that the July 14 fall had occurred when he tripped on a step, after which he fell backwards. (*Id.*) He said lightheadedness had contributed to the fall. (*Id.*) He said he had had a headache since the fall, but it had not worsened. (*Id.*) He asked if he could switch his walker for one with a seat. (*Id.*) Coffey advised against this because those other walkers have wheels and would not provide stability. (*Id.*)

In response to Holmes's complaints of continued dizziness and falls after the July 2022 fall, Coffey referred him for a cardiology consult, a nuclear medicine cardiac stress test, three days of Holter monitoring, many lab tests, and x-rays. (*Id.* ¶ 27.) He also talked with Holmes's psychiatrist about his psychiatric medications, some of which are known to cause orthostasis. (*Id.*) In response, Holmes's psychiatrist made changes to his psychiatric medications but the orthostasis symptoms continued. (*Id.*)

On November 13, 2022, Holmes reported a fall which he believed was caused by his orthostasis. (*Id.* ¶ 28.) Holmes had become dizzy in the shower, then slipped and fell. (*Id.*) Coffey again diagnosed orthostasis and probable dehydration. (*Id.* ¶ 29.) On December 9, 2022, Coffey consulted with a cardiologist regarding Holmes's low blood pressure and orthostasis. (*Id.*

¶ 30.) The cardiologist agreed with the course of treatment Coffey recommended to Holmes on June 23, 2022, which included directing Holmes to wear compression stockings, liberally intake salt, increase hydration, squeeze his lower extremities before standing up, and to stand up slowly. (*Id.*)

Holmes reported another fall on August 15, 2023. (*Id.* ¶ 31.) Coffey again sent Holmes to the emergency room at the local hospital for further evaluation. (*Id.*) The emergency room report noted that Holmes "has a history of syncopal episodes and uses a walker in jail for stabilization and is able to 'feel them coming on' and is normally able to sit down without sustaining secondary trauma from a fall." (*Id.*) "A CT scan showed no evidence of acute fractures and the hospital released him in stable condition." (*Id.*)

**STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a

genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

## DISCUSSION

Holmes claims that Defendants (i) were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment; and (ii) are liable under state law for negligence and violation of California's Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code §§ 15600, et seq.). (Order of Service, Dkt. No. 8 at 2.)

### i. Deliberate Indifference

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating the standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

The Supreme Court has further clarified this standard by holding that "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by

the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A mere accident or evaluative mistake is not to be characterized as wanton infliction of unnecessary pain. *Estelle*, 429 U.S. at 105. Instead, a plaintiff must show that his doctors or nurses embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

**A. Dr. Coffey**

Coffey has presented undisputed evidence that the treatment he provided was reasonable and not constitutionally deficient. Holmes has not presented evidence that precludes summary judgment. The undisputed record shows that Coffey had no reason to believe that granting Holmes's housing request was required before the July 2022 fall. The symptoms of orthostatic hypotension undisputedly "only occur upon standing and usually resolve very quickly — in a matter of seconds." Based on his examination of Holmes, Coffey concluded that "his symptoms only occurred upon standing from a sitting position and were very short in duration." If such symptoms occur only upon standing and disappear shortly, Holmes would be sufficiently clear-headed to ambulate safely within his second-tier housing after waiting briefly for the symptoms to dissipate. He was also provided a plan to manage his symptoms to keep himself safe. Coffey's diagnosis was confirmed by emergency room physicians and by the cardiologist who was consulted. All agreed on the on Coffey's June 2022 treatment plan, which directed Holmes to wear compression socks, take salt, increase hydration, squeeze his lower extremities before standing up, and to stand up slowly.

There are additional reasons that support Coffey's belief that a housing accommodation was not required. Holmes had lived in second-tier, upper bunk housing without any reported falls or any other concerns since he started having dizzy spells in July 2021. He also did not otherwise meet the criteria for such an accommodation: he did not have a mobility impairment

and he did not have a medical need to be moved to a lower-tier cell.

Furthermore, by his own admission, Holmes was experiencing symptoms before he left his cell and before he approached the stairs in July 2022. He could have stayed in his cell and waited for the dizziness and other symptoms to pass, but he did not. Rather, he proceeded to the stairs while he was experiencing the symptoms. His actions under these circumstances do not indicate any failure on the part of Defendants.

The motion for summary judgment is unopposed. A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition. *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994) (unopposed motion may be granted only after court determines that there are no material issues of fact). The Court may, however, grant an unopposed motion for summary judgment if the movant's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact. *See United States v. Real Property at Incline Village*, 47 F.3d 1511, 1520 (9th Cir. 1995) (local rule cannot mandate automatic entry of judgment for moving party without consideration of whether motion and supporting papers satisfy Fed. R. Civ. P. 56), rev'd on other grounds sub nom. *Degen v. United States*, 517 U.S. 820 (1996); *Henry v. Gill Industries, Inc*., 983 F.2d 943, 950 (9th Cir. 1993) (same).

The papers in support of the motion for summary judgment are evidence that Coffey was aware of Holmes's medical needs and adequately addressed them with medical care acceptable under the circumstances. He examined Holmes, gave him a diagnosis with which other doctors and Holmes agreed was correct. Holmes was experiencing lightheadedness and other symptoms upon standing, but they quickly dissipated. Holmes knew how to steady himself and to wait until the symptoms passed before ambulating. Coffey provided a walker to assist Holmes. There was no reason for Coffey to believe that changing Holmes's housing was needed. Nothing in the record shows that Coffey embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi*, 391 F.3d at 1058-60. Furthermore, Holmes started experiencing his symptoms in his cell, prior to the fall. His

decision to proceed to the stairs does not indicate that Coffey was at fault for the fall.

In sum, the movants' papers are sufficient to support the motion and do not on their face reveal a genuine issue of material fact. Accordingly, Defendants' motion for summary judgment is GRANTED in favor of Coffey on Holmes's deliberate indifference claims.

**B. Mancillas, Alcantar, and Nakawuka**

Summary judgment will be granted in favor of Defendants Mancillas, Alcantar, and Nakawuka on Holmes's deliberate indifference claims. None of these Defendants had the authority to change Holmes's housing assignment. Nor could they start the process by reporting Holmes's complaints to their superiors. Defendants have presented undisputed evidence that to change his housing assignment, a prisoner must file a Reasonable Accommodation Request form. Orally communicating a request to staff is not sufficient. Accordingly, Defendants' motion for summary judgment is GRANTED in favor of Mancillas, Alcantar, and Nakawuka on Holmes's deliberate indifference claims.

**C. Qualified Immunity**

Defendants contend that they are entitled to qualified immunity. (MSJ, Dkt. No. 32 at 21.) The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show that the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the

officer's conduct violated a constitutional right? *Saucier*, 533 U.S. at 201; *see Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004) (in performing the initial inquiry, court is obligated to accept plaintiff's facts as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is stated for a violation of plaintiff's constitutional rights, but rather whether the defendants actually violated a constitutional right) (emphasis in original). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Defendants are entitled to qualified immunity. Coffey was aware of Holmes's medical needs and adequately addressed them with medical care acceptable under the circumstances. He examined Holmes, gave him a diagnosis with which other doctors and Holmes agreed. Holmes was experiencing lightheadedness and other symptoms upon standing, but they quickly dissipated. Holmes knew how to steady himself and to wait until the symptoms passed before ambulating. Coffey provided a walker to assist Holmes. There was no reason for Coffey to believe that changing Holmes's housing was needed. Also, the remaining Defendants lacked the authority to grant Holmes's housing request. Because the allegations do not show a violation of a constitutional right, this order need not reach Defendants' other arguments in favor of qualified immunity.

**ii. Negligence and Elder Abuse and Dependent Adult Civil Protection Act Claims**

Holmes's state law claim of negligence and his claim under the California's Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code § 15610.63) are time-barred because he did not comply with the claims presentation requirement of the California Tort Claims Act, *see* Cal. Gov't Code §§ 810, et seq. The Act requires a person to present his claim to the California Victim Compensation and Government Claims Board (Board) before he may file an action for damages against a California governmental entity or employee "for death or for injury to person or to personal property." Cal. Gov't Code § 911.2; *see id.* §§ 905.2, 911.2, 945.4, 950.2. A claimant must present his claim to the Board within six months of the accrual of the cause of action. *See id.* § 911.2. Additionally, an action against a governmental entity or

employee covered by the claims presentation requirement must be filed within six months following written notice of rejection of the claim by the Board. *See id.* § 945.6(a)(1). If written notice is not given, suit must be filed within two years from the accrual of the cause of action. *Id.* § 945.6(a)(2).[1]

Timely claim presentation is "a condition precedent to plaintiff's maintaining an action against [a state employee or entity] defendant," which means that timely presentation is not just an affirmative defense for the government, but an element of plaintiff's cause of action. *California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1240 (Cal. 2004). A failure to comply with the presentation requirement bars review of state tort claims in federal court. *Karim-Panahi v. Los Angeles Police Dept*., 839 F.2d 621, 627 (9th Cir. 1988) (citing *Ortega v. O'Connor*, 764 F.2d 703, 707 (9th Cir. 1985), rev'd on other grounds, 480 U.S. 709 (1987)).

Here, Holmes submitted a claim to the Government Claims Program (GCP) regarding the July 14, 2022 incident. On December 13, 2022, the GCP received Holmes's claim and his request to waive the $25.00 filing fee. (MSJ, Thorn Decl., Department of General Services Letter to Holmes, Dkt. No. 40-6 at 13.) On February 16, 2023, the GCP informed Holmes that it (1) denied his fee waiver request because he did not meet the statutory requirements for a waiver, and (2) it could not process his claim until he submitted the fee. (*Id.*) Holmes testified that he paid the filing fee (Holmes Depo., Dkt. No. 40-2 at 50), but the GCP search does not show that the fee was paid to or received by the GCP. (*Id.*, Email from Government Claims Unit, Dkt. No. 40-5.) Nor does the search show that the GCP ever provided Holmes with a notice of rejection or took any other action or decision regarding his claim. (*Id.*)

As Defendants point out, even assuming Holmes had paid the fee, it is undisputed that the GCP never provided the notice of rejection or a notice that any action had been taken on his claim. This means that he had two years from the accrual date to file an action against the

[1] This requirement applies equally to imprisoned plaintiffs. *Johnson v. County of Riverside*, No. 5:23-cv-02411-MRA-PVC, 2024 WL 6822010, at *3 (C.D. Cal. Jul. 29, 2024). The language in section 945.6(b) stating that prisoners are exempt from the six-month deadline is no longer operative. *Id.*

government. The accrual date is July 14, 2022, when the fall occurred. This means that Holmes had until July 14, 2024, to file suit. However, his current action was not filed until March 25, 2025, which is after that date.

Defendants' motion for summary judgment is GRANTED in favor of all Defendants on Holmes's negligence claims and his claims under the California's Elder Abuse and Dependent Adult Civil Protection Act.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED in favor of all Defendants as to all claims. The Clerk shall terminate Dkt. No. 32, enter judgment in favor of Defendants, and close the file.

**IT IS SO ORDERED.**

**Dated:** October 15, 2026

RITA F. LIN
United States District Judge